Filed 3/13/26  P. v. Pacheco CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE MANUEL PACHECO,<br><br>    Defendant and Appellant. | H052374<br>(Santa Clara County<br>Super. Ct. No. C2202882) |

Defendant Jose Manuel Pacheco was convicted by a jury of multiple forcible sexual offenses he committed against two of his cousins, M. Doe and J. Doe,[1] who were respectively 12 years old and eight years old at the time of those offenses.  The trial court sentenced Pacheco to a total term of 50 years to life.

On appeal, Pacheco argues the trial court erred in admitting expert testimony on Child Sexual Assault Accommodation Syndrome (CSAAS), erred in instructing the jury on how to evaluate CSAAS testimony, and erred by giving a modified instruction on forcible rape.  In the alternative, if this court deems any of these arguments waived due to trial counsel's failure to timely object, Pacheco

---

[1] Although the victims were identified at trial by their first names, with "Doe" as a last name, we will instead use their first initials (along with Doe) to better protect their privacy interests.  (Cal. Rules of Court, rule 8.90(b)(4).) Unspecified rule references are to the California Rules of Court.

contends that his trial counsel was constitutionally ineffective. Pacheco also notes that there is a discrepancy between the $300 restitution fund fine imposed by the trial court at sentencing and the abstract of judgment which reflects a $330 restitution fund fine.

We reject Pacheco's substantive claims in their entirety but agree that the abstract of judgment must be corrected. Because the minute order from Pacheco's sentencing hearing also incorrectly recorded the amount of the restitution fund fine, we will affirm the judgment and direct the trial court to correct both the minute order and the abstract of judgment to conform with the trial court's oral pronouncement of judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural background

On February 26, 2024, the Santa Clara County District Attorney filed an amended information charging Pacheco with one count of forcible lewd acts on a child under 14 (Pen. Code,[2] § 288, subd. (b)(1); count 1 (M. Doe)); one count of nonforcible lewd acts on a child under 14 (§ 288, subd (a); count 2 (M. Doe)); one count of sexual battery (§ 243.4, subd. (a); count 3 (M. Doe)); three counts of sexual intercourse with a child age 10 or younger (§ 288.7, subd (a); counts 4, 5, 6 (J. Doe)); three counts of forcible rape of a minor under age 14 (§§ 261, subd. (a)(2), 264, subd. (c)(1)); counts 7, 8, 9 (J. Doe)); and one count of exhibiting harmful material to a minor (§ 288.2, subd. (a); count 10 (N. Doe)). The information further alleged that counts 1, 2, 7, 8, and 9 were committed against more than one victim (§ 667.61, subd. (j)(2)), that counts 7, 8, and 9 were committed against a minor under age 14 (§ 264, subd. (c)(1)), and that as to all

---

[2] Unspecified statutory references are to the Penal Code.

2

counts, Pacheco took advantage of a position of trust within the meaning of rule 4.421(a)(11).

The jury convicted Pacheco on counts 2, 4, 5, 7, and 8 as charged and convicted him of the lesser included offense of nonforcible lewd acts on a child in count 1. The jury found Pacheco not guilty on counts 6 and 9, and after the jury reported it could not reach a verdict on counts 3 and 10, the court declared a mistrial as to those counts.

The jury found true the multiple victim allegations associated with counts 1, 2, 7, and 8, and the allegations that the victim in counts 7 and 8 was under age 14. In a bifurcated proceeding, the jury also found true the aggravating factor that, with respect to counts 1 and 2, Pacheco violated a position of trust within the meaning of rule 4.421(a)(11). The jury could not reach a finding on the aggravating factor with respect to counts 4, 5, 7, and 8, and the court declared a mistrial on those allegations.

On July 8, 2024, the trial court sentenced Pacheco to a total term of 50 years to life, consisting of a term of 25 years to life on count 1, a consecutive term of 25 years to life on count 4, and concurrent terms of 25 years to life on counts 2 and 5. The court imposed separate terms of 25 years to life on counts 7 and 8, but stayed the punishment on both counts pursuant to section 654. The court awarded Pacheco a total of 803 days of credits, consisting of 803 custody credits and 0 conduct credits.

As to fines and fees, the court ordered Pacheco to pay a $300 restitution fund fine (§ 1202.4, subd. (b); a $300 parole revocation fund fine, suspended pending successful completion of parole (§ 1202.45); and a $300 sex offender registration fine plus penalty assessments (§ 290.3). The court struck the court operations assessment (§ 1465.8) and the criminal conviction assessment (Gov. Code, § 70373).

3

Pacheco timely appealed.

### B. Factual background[3]

#### 1. M. Doe's testimony

M. Doe,[4] who was 20 years old at the time of trial, testified that she first met Pacheco in 2012 when she was seven or eight years old.  M. Doe considered him to be family and initially did not feel uncomfortable when he was around.

In 2016, when M. Doe was 12 or 13 years old, Pacheco "started changing and acting weird towards" her.  Pacheco began giving her nicknames, such as "Muñequita," which is Spanish for "doll."  Pacheco would not use this nickname in front of anyone else but would only call her that if they were alone or when he sent her texts.[5]  Pacheco would also tell M. Doe she was "beautiful and that he wanted a different kind of relationship."

At that time, Pacheco was coming to M. Doe's house "[m]ostly every other weekend" to spend time with her family.  Whenever Pacheco and M. Doe were alone in the same room for a moment, Pacheco would tell her she was beautiful.  Pacheco would also try to get M. Doe to go to the store or on other errands with him.  Pacheco treated M. Doe differently, offering to buy things that she wanted, and getting her birthday gifts even though he did not buy birthday gifts for anyone else.  On Valentine's Day one year, Pacheco bought a teddy bear for her.  M. Doe felt uncomfortable when Pacheco gave her that gift.

---

[3] Pacheco did not present evidence on his own behalf.  Because the jury acquitted Pacheco of count 3 (sexual battery of M. Doe) and count 10 (exhibiting harmful material to N. Doe), we do not recount the testimony relating to those offenses.

[4] M. Doe was one of seven children and had two younger sisters, N. Doe and J. Doe.  Pacheco is her father's nephew and one of approximately 14 cousins with whom M. Doe and her family regularly interacted.  M. Doe testified that all these cousins were "much older" than her and her sisters.

[5] Pacheco listed M. Doe as "Muñequita" in his cell phone contacts.

### a. M. Doe describes the offenses (counts 1, 2)

On Easter in 2016, M. Doe was at Santa Teresa Park with her family as well as her aunts and cousins, including Pacheco. Everyone was running around, and M. Doe took a break to drink some water. Pacheco pulled her away from the others, and he said to her, " 'Oh, you're so beautiful. Do you want to be my girlfriend?' " M. Doe did not tell anyone about this but tried to stay around other family members the rest of the day.

M. Doe testified that when she was 13 years old, Pacheco was at her house for a family "movie night." There were multiple people in the living room watching a movie, with Pacheco sitting on the couch between M. Doe and another cousin. M. Doe was sharing a blanket with Pacheco and the other cousin and, as the movie played, Pacheco "put his hands under my pants." Pacheco put his hand inside M. Doe's underwear and touched the lips of her vagina with his fingers. Pacheco did not penetrate her vagina. M. Doe felt uncomfortable, confused, and "disgusted," but did not say anything as she was "in shock[]" and did not know what to do. M. Doe testified that Pacheco touched her in this way more than three times, with "weeks" passing between each incident, but she never wanted him to touch her vagina.

On redirect examination, M. Doe testified that on another movie night, where they watched a movie in M. Doe's bedroom, her aunt stayed the night and slept in M. Doe's room. M. Doe slept on the floor, as did Pacheco. During the night, M. Doe felt Pacheco "closer to [her]" and then "felt something warm" on her stomach. M. Doe was scared, and Pacheco "wiped it down with his shirt."

On July 4, 2016, M. Doe and her family, along with Pacheco and some other cousins, went to a park in Livermore to celebrate. Pacheco drove M. Doe, and M. Doe's older brother to the park around 7:00 a.m. to reserve a spot. The park was filling up with people, and M. Doe wanted to call her parents but could

not get a cell phone signal at the picnic table. M. Doe's brother remained at the table with one of Pacheco's friends while M. Doe and Pacheco walked up a hill to try and get cell reception. After walking for twenty to thirty minutes, Pacheco was able to reach M. Doe's parents, who said they were going back home because they were not letting anyone into the park anymore. M. Doe and Pacheco started to come back down the hill when Pacheco pulled M. Doe off into a bush. Pacheco put his sweater on the ground, pushed M. Doe onto his sweater, and then got on top of her. Pacheco started kissing her. M. Doe could not move and tried to push Pacheco off.[6] She was scared that Pacheco was going to do more to her like he did during the movie night.[7] However, Pacheco stopped and got up.

M. Doe and Pacheco went back to the picnic table, but M. Doe did not say anything to her brother about what Pacheco did. M. Doe stayed at the park with Pacheco, her brother, and Pacheco's friends for some time, even though she was uncomfortable. M. Doe did not tell her parents or her sisters after she got home.

Pacheco kissed her on the lips "more than ten times" thereafter, sometimes at her house or "when he would catch moments" where he was alone with M. Doe. M. Doe was disgusted by Pacheco's behavior and did not want him to kiss her.

### b. Text messages and M. Doe's disclosure

M. Doe authenticated text messages she exchanged with Pacheco in 2016 and 2017. Pacheco sent M. Doe text messages asking why she was not "hanging

---

[6] Pacheco was taller, weighed more, and was stronger than M. Doe. At the time of trial, M. Doe was 4 feet, 10 inches tall and weighed 125 pounds, but was both shorter and weighed less in 2016.

[7] On cross-examination, M. Doe admitted she was not certain whether the movie night incidents occurred before or after the July 4 incident at the park in Livermore. M. Doe acknowledged that, at the preliminary hearing, she testified that the movie night incidents occurred after the July 4 incident. On redirect examination, M. Doe testified that the July 4 incident took place after the time that Pacheco touched her vagina as they watched a movie.

out" with him and why she would not kiss him. The messages made M. Doe uncomfortable. In one message, Pacheco texted " 'You don't kiss me[]' " and M. Doe replied, " 'Tomorrow if you come. Okay, baby.' " Pacheco replied, " 'No. I'm not going to come back. You never kiss me.' " M. Doe texted to Pacheco, " 'Yes, you have to come,' " and he replied, " 'For what?' " M. Doe responded, " ' So that I can kiss you.' " M. Doe testified that she replied in this fashion because she understood that Pacheco was angry because he "wasn't getting what he wanted," and she was afraid he would hurt her.

M. Doe's mother, Maria D., learned about the text messages with Pacheco and showed them to M. Doe. Maria asked her if Pacheco had touched her, but M. Doe said he had not. M. Doe testified that she lied to her mother because she "didn't want a big problem[,]" was scared of what might happen, and feared that Pacheco would say she was lying. M. Doe said that she loved her family, and this would create a "family problem." M. Doe felt overwhelmed and alone.

On February 14, 2022, M. Doe, who was then 18 years old, told her boyfriend J.R.[8] about what Pacheco had done to her. M. Doe said that "it was already eating me up inside and I had to say something." After she told her boyfriend, M. Doe also talked to her sisters to see if Pacheco had done anything with them. While she was headed to her parents' house, M. Doe called J. Doe and said that Pacheco had sexually assaulted her but did not give any details. J. Doe began crying and said "something happened" to her as well, but J. Doe did not give any details.

---

[8] J.R. and other civilian witnesses were identified at trial by name, but we will instead use their first and last initials to protect their privacy interests along with the victims'. (Rules 8.90(b)(10), (11).)

M. Doe got to her parents' house and spoke to her mother and father outside because Pacheco was inside the house. M. Doe told her mother what happened.

The following day, M. Doe spoke to a police officer at the hospital.

### 2. J.R.'s testimony

J.R., who was 23 years old at the time of trial, testified that M. Doe is his girlfriend, and they had been living together for one year. On February 14, 2022, M. Doe was crying and "acting very distant" toward him. She told him that someone in her family had touched her and sent her text messages "when she was younger." When asked at trial if he recognized Pacheco, J.R. said he had met Pacheco once at M. Doe's 18th birthday party.

J.R. testified that M. Doe told him that J. Doe had also been "through something similar" and J. Doe later told him "she was going through the same thing." Both M. Doe and J. Doe were "afraid to tell their parents." When J.R. encouraged M. Doe to tell her parents, M. Doe told J.R. that Pacheco threatened J. Doe and that Pacheco had sent her text messages when she was younger saying he would hurt her or her family if she told anyone.

### 3. J. Doe's testimony

#### a. J. Doe describes the offenses (count 4, 5, 7, 8)

J. Doe, who was 16 years old at the time of trial, testified that she had known Pacheco since she was little. In August 2015, around J. Doe's eighth birthday, Pacheco picked up J. Doe in his car.[9] J. Doe said Pacheco was going to pick up J. Doe's aunt and give her a ride to work. J. Doe's siblings were supposed to come along as well, but they ended up not coming with her and Pacheco. On

---

[9] When shown a photograph of herself when she was around eight years old, J. Doe estimated that she was a little over three feet tall and weighed about 90 pounds at that time.

8

the way to her aunt's house, Pacheco parked on a residential street by a school. At his direction, J. Doe got into the back seat of Pacheco's car. Pacheco was an authority figure in her mind, and her parents had taught her to listen to adults. Pacheco put a sunshade to cover the windshield and climbed into the back seat with J. Doe. On cross-examination, J. Doe testified that this took place in the afternoon and there were pedestrians walking past the car.

Pacheco pulled down J. Doe's clothing, including her underwear, grabbed her around the waist and placed her on top of him. Pacheco was sitting in the back seat and was naked from the waist down. Pacheco put his penis inside J. Doe's vagina and began moving her up and down. J. Doe tried to move away but could not. Pacheco was taller, heavier, and stronger than she was. Suddenly, Pacheco got a phone call from J. Doe's aunt and stopped. Pacheco lifted J. Doe off his lap and "put his sperm in his sock." He and J. Doe then proceeded to pick up J. Doe's aunt. J. Doe did not say anything to her aunt or her parents because she was afraid Pacheco would do something to her family.

In November 2015, J. Doe went with Pacheco to get ice cream. Some of her other cousins were supposed to come with them, but they rode with J. Doe's aunt, so it was just J. Doe and Pacheco in his car. Pacheco parked his car near the ice cream shop and told J. Doe to get a shirt from the back of his car. After J. Doe got into the back seat to look for the shirt, Pacheco got in the back seat with her. Pacheco took J. Doe's bottom clothing off, picked her up, and placed her on his lap as he sat in the back seat. Pacheco was again naked from the waist down and he inserted his penis into her vagina. Pacheco kept his hands around J. Doe's waist and moved her up and down. He told her not to say anything, which made J. Doe afraid that Pacheco would do something bad. J. Doe did not remember how the incident ended but afterward she and Pacheco went into the store and got ice

9

cream.  J. Doe did not tell anyone what happened after she returned home because she was frightened.

J. Doe testified about a third incident that occurred in 2015 where she went to a store with Pacheco.  Pacheco parked his car in the store's parking lot.  J. Doe was in the back seat with Pacheco, and they were both naked from the waist down.  J. Doe was straddling Pacheco, facing him, and Pacheco inserted his penis into her vagina.

On cross-examination, after defense counsel refreshed J. Doe's recollection with her preliminary examination testimony, J. Doe said that the second incident occurred when she went with Pacheco to the store and the third incident was when she went with him to get ice cream.

J. Doe again did not tell anyone what happened because she was scared. Pacheco told her that if she said anything, he would "do something" to her family.

### b. J. Doe's disclosure

J. Doe testified that she got a phone call from M. Doe in February 2022 in which M. Doe told her that Pacheco had "done something to her."  M. Doe was crying but did not give her any details.  J. Doe was confused[10] and did not know what was going on at first.  After M. Doe told J. Doe that "something had happened with her and [Pacheco]," J. Doe told M. Doe that Pacheco had done something with her as well.

M. Doe and her boyfriend, J.R., subsequently came over to J. Doe's house. Once there, M. Doe and J. Doe told their mother what happened.  Because M. Doe "had spoken up[,]" J. Doe felt she could disclose what happened to her because she "had somebody to support" her.

_____

[10] On cross-examination, J. Doe testified that she was confused by M. Doe's call because M. Doe initially asked her how she could " 'keep going to [Pacheco's] soccer games and supporting him after something he's done.' "

J. Doe also testified that, when she was a freshman or sophomore in high school, she disclosed Pacheco's sexual assaults to a friend. This was before she told M. Doe or her mother about what Pacheco had done.

### 4. Maria D.'s testimony

Maria D. testified that Pacheco is her partner's nephew, and she believed that, at the time of trial, Pacheco was 37 years old. Maria D. trusted Pacheco and considered him part of her family. From 2011 to 2017, Pacheco would come over to her home about three times a week to visit with the family and her family would sometimes go and watch Pacheco play soccer. He would sometimes take some of her children to get ice cream or to the store.

Maria D. testified that the family planned to go to a park in Livermore on July 4, 2016, to celebrate the holiday. Pacheco had driven M. Doe and her older brother to the park separately. When Maria D. and the others got to the park, however, the parking lot was full, and they returned home.

In 2017, Maria D. became aware of text messages that Pacheco had sent to M. Doe. Maria D. confronted Pacheco about the messages and told him that he was not welcome in her home any longer. A little before 2020, however, Pacheco started coming by the house again, but it "wasn't like before." Maria D. "wouldn't receive him in the same way that [she] did before." Although she did not want to invite him to the house, "sometimes he would arrive without us inviting him in." Maria D. began going to Pacheco's soccer games again along with her daughters, but she or her partner would always be there as well.

In February 2022, M. Doe told Maria D. that Pacheco had touched her when she was younger. On that same day, J. Doe told Maria D. that Pacheco had raped her. Both M. Doe and J. Doe were crying and upset. Maria D. called their pediatrician who told her to take the girls to the hospital. At the hospital, Maria D.

11

told a nurse what her daughters had told her, and someone at the hospital called the police.

### 5. *Expert in sexual assault forensic examinations (SAFE)*

Mary Ritter, a physician assistant and lead examiner at the Santa Clara County Children's Advocacy Center, testified as an expert in SAFE, anatomy injury identification, and potential causes of injury. Ritter conducted a SAFE of M. Doe on February 23, 2022, but did not do swabs for forensic evidence because the last reported abuse took place in 2020 which was more than 72 hours before the exam. In her physical examination, Ritter could make no findings of penetrating trauma. Ritter could not conclude that M. Doe had not been touched as she described because the mucosa of the vagina heals rapidly. Because M. Doe was an adult at the time of the exam, her hymen had become more elastic so if there was any injury to it in the past, it would be hard to see. Ritter testified that a finger could have penetrated M. Doe's vagina without injuring her hymen. In Ritter's opinion, none of the findings from M. Doe's exam were inconsistent with the history provided.

Ritter conducted a SAFE of J. Doe on that same day. Because the last reported incident took place more than 72 hours before the exam, Ritter did not collect forensic evidence from J. Doe. Ritter's physical examination disclosed no signs of tears or abrasions or penetrating trauma. Just like with M. Doe, however, this did not rule out the possibility of prior sexual conduct because any resulting injuries would have had ample time to heal. Since J. Doe was 14 years old at the time of the exam, her hymen was also estrogenized and any bruising would have healed within two weeks. Again, in Ritter's opinion, the lack of findings was not inconsistent with the history provided.

### 6. Police investigation

In 2022, San Jose Police Officer Pilar Montez was a detective assigned to the sexual assault investigation unit. As part of her investigation into the report of child sexual abuse, Montez determined that Pacheco was born on April 15, 1987. Montez conducted forensic interviews of M. Doe and J. Doe on February 25, 2022, at the Child Advocacy Center. At the time of those interviews, M. Doe was 18 years old, and J. Doe was 14 years old.

Montez also obtained from Maria D. text messages exchanged by Pacheco and M. Doe in 2017. In one message, Pacheco texted M. Doe, whom he had listed in his contacts as "[M]uñequita," " 'I'm not going to come. You never kiss me.' " In a second message, Pacheco texted M. Doe, " 'You're not gonna do it' " and " 'It's not true.' "

Montez also interviewed J.R., who explained that M. Doe began acting strangely so he asked what was going on. At first, M. Doe did not want to say anything but then she admitted "someone had touched her" though she was afraid to tell her parents. J.R. told Montez that he encouraged M. Doe to talk to her sisters since Pacheco might have touched them as well. J.R. also said that M. Doe told him that, when she was younger, Pacheco threatened her so she would not tell anyone.

### 7. CSAAS evidence

Dr. Lauren Maltby, supervising forensic psychologist at the Los Angeles Department of Health Services and a clinical psychologist, testified "as an expert in forensic psychology as it relates to child sexual abuse and an expert in the area of CSAAS."

Dr. Maltby testified that she had not done any investigation, interviewed any witnesses, read any police reports or transcripts, spoken to any of the attorneys, knew nothing about the facts or charges alleged, had never met

13

Pacheco, and had not spoken to any law enforcement officers about the case. Dr. Maltby confirmed that she did not have any opinion about whether anyone was sexually abused in this case but was relaying "what research says about child sexual abuse." Dr. Maltby emphasized that "CSAAS can't be used to diagnose sexual abuse." Instead, "CSAAS is only trying to provide context to behaviors that might seem surprising or confusing to adults."

Dr. Maltby testified to concepts that CSAAS describes as not being inconsistent with possible sexual abuse. She first discussed the concept of secrecy. Dr. Maltby testified that an abuser must keep the abuse secret so that it can continue. To maintain this secrecy, the abuser will threaten the victim with harm or tell them that a parent will be angry if they learn of the abuse. However, since many abusers are within the victim's "circle of trust," and have repeated contact with the victim, they can also use rewards or special attention to encourage the victim's silence. The concept of secrecy does not necessarily refer to the location where the abuse occurs, as opposed to "there aren't witnesses and that you don't talk about it." The abuse often "occurs quickly and with other people in close proximity."

Dr. Maltby testified that, because an abuser often forms a special relationship with the victim and only gradually escalates from non-sexual to sexual touching, it is not inconsistent that a victim of abuse will not report what happened. As the touching has occurred many times previously, the victim fears that they will get into trouble for not having reported it sooner or that they will not be believed.

Dr. Maltby next described the concept of helplessness in CSAAS. She testified that helplessness refers to how children are dependent on adults, for housing and food, but also for "mental and emotional survival." Consequently, children cannot simply "terminate [problematic] relationships with adults" and

14

"are conditioned to submit to adult demands." A perpetrator of sexual abuse on a child commonly has a pre-existing relationship with that child, such as a relative who lives in the home, a coach, or a youth pastor, for example. Dr. Maltby explained that although children are taught to report when someone touches their private parts, if the person touching them is a trusted adult, the child is "really stuck."

According to Dr. Maltby, the concept of accommodation describes how victims cope with ongoing abuse. Victims will try different ways to prevent the abuse from happening, such as asking for a lock on the bedroom door, asking to sleep over at friends' homes more often, wearing two sets of pajamas to bed, or pretending to be asleep. Because these strategies are usually ineffective, the victims turn to "avoidance or denial." The victims will compartmentalize the fact of the abuse "in a tiny box in their brain" and pretend that nothing is happening. "[I]t takes a long time sometimes to open the box" and disclose the abuse to another.

Another side of accommodation is where victims may try to regain some agency by attempting to "get something out of [the abuse]" such as money or preferential treatment. This does not mean that the victims want the abuse to happen, but since they are unable to stop it, this is a way for victims to feel that they have some control.

Dr. Maltby testified that victims often do not physically resist. Because victims cannot fight back or flee from the abuser, they will instead freeze. Even if they do not freeze, the victims do not call for help because of the ambivalent feelings they may have for the abuser. While they want the abuse to stop, they also do not want the abuser to get in trouble. Abusers "very often" foster a relationship with the victim so that the victim "becomes even more dependent on that relationship to meet their emotional needs." Counterintuitively, a victim will

15

continue to engage with or spend time with the abuser and will even show affection toward them.  Because children are good at distinguishing the environments where abuse takes place from environments where it will not, the victim will not appear to be afraid of the abuser when they are in public, around other family members, at school, or where others can see them.

Dr. Maltby described the concept of "delayed and unconvincing disclosure" as "referring to the fact that most children delay disclosure[,] … [¶] "[and] that children tell in a way that we sometimes call piecemeal disclosure."  Victims will "tell a little bit and kind of see" how the adult reacts before sharing more information.  Like most people, victims are uncomfortable discussing their private parts and sexual acts and can be overwhelmed by disclosing everything at once.

Furthermore, Dr, Maltby testified that children and teenagers are not good at recalling time and numbers, so where sexual abuse is repeated, the victims "are not keeping a daily log of every incident."  Because the abuse is unpleasant, the victims try not to think about it.  Although children can give a narrative account or recall specific instances of abuse, their ability to accurately estimate how many times or the order in which the instances of abuse occurred is not very good.  Where the abuse has occurred multiple times, a victim will not necessarily be able to give specific details about what occurred.  Where a person "experience[s] a repeated event multiple times [] occur[ring] in roughly the same way every time[,]" the memories of all those incidents tend to merge.  Under those circumstances, a victim may say that something happened in one incident when it happened in another.  It is not that the incident did not happen, just that the victim gave "it the wrong placement."

Dr. Maltby reiterated that CSAAS is an educational tool, not "a checklist for diagnosing sexual abuse[,]" and cannot "be used to prove whether a child was sexually abused."

16

On cross-examination, Dr. Maltby agreed that there are many behaviors which are consistent with sexual abuse. Because of the difficulty in researching sexual abuse, psychologists are limited to "naturalistic" studies.

## II. DISCUSSION

### A. Trial court did not err in admitting CSAAS testimony

Pacheco argues the trial court erred in admitting CSAAS testimony for the following reasons: (1) CSAAS evidence is "inherently unreliable"; (2) the trial court should have excluded the testimony under Evidence Code section 352 as it was more prejudicial than probative; (3) the CSAAS expert testimony was improper as it was "profile" evidence suggesting that Pacheco did sexually assault M. Doe and J. Doe; (4) the limiting instruction regarding CSAAS evidence given to the jury, CALCRIM No. 1193, improperly allowed the jury to consider Dr. Maltby's testimony as evidence that M. Doe and J. Doe were telling the truth; and (5) admitting the CSAAS evidence rendered his trial fundamentally unfair, thus violating his due process rights. In the alternative, Pacheco argues that if any of his arguments regarding CSAAS evidence and CALCRIM No. 1193 are deemed forfeited due to trial counsel's failure to object below, his trial counsel was constitutionally ineffective.

In response, the Attorney General argues that, as to Pacheco's claim that CSAAS evidence is unreliable, the California Supreme Court in *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*) and numerous California appellate courts have approved of its use in cases involving child sexual abuse. The Attorney General next counters that the trial court did not abuse its discretion under Evidence Code section 352 in admitting the CSAAS evidence as the highly probative evidence was not substantially outweighed by the risk of prejudice. The Attorney General also argues that Dr. Maltby's testimony did not constitute improper profile evidence.

17

The Attorney General argues that Pacheco has forfeited his contention that the jury was misinstructed with CALCRIM No. 1193 by failing to object to this instruction below but alternatively argues that the instruction was proper. The Attorney General also argues that Pacheco failed to raise a due process objection to Dr. Maltby's testimony at trial and thus forfeited that claim on appeal. In the alternative, the Attorney General contends that Pacheco's due process argument fails on the merits and that he cannot show he was prejudiced by the admission of Dr. Maltby's testimony.

The Attorney General also contends that Pacheco's ineffective assistance of counsel arguments fail because he cannot show that counsel was ineffective or that he was prejudiced by counsel's failure to object.

As discussed below, we agree with the Attorney General that there was no error in admitting CSAAS evidence or instructing the jury with CALCRIM No. 1193. In the one instance where we assume error in admitting Dr. Maltby's testimony regarding the percentage of child sexual abusers who are known to the victim(s), we conclude that error was harmless.

### 1. Additional background

Before trial, the prosecutor moved in limine to admit Dr. Maltby's testimony regarding CSAAS arguing that her testimony met the criteria for expert testimony and that CSAAS "testimony is commonly used to disprove common myths and misconceptions about children's reactions to sexual abuse. [Citations.]" The prosecutor indicated that the evidence would "assist the trier of fact in assessing the credibility of the complaining witness[es]" but would "not be offered to prove that a sexual assault occurred." The prosecutor also noted that the admonition in CALCRIM 1193 and CALJIC 10.64 would instruct the jury not to consider the testimony for impermissible purposes.

18

Defense counsel also filed an in limine motion seeking to exclude CSAAS testimony, arguing: (1) the testimony "does not meet the *Kelly-Frye* standard of reliability for the admissibility of new scientific methods of proof"; (2) the testimony should be excluded under Evidence Code section 352 as its probative value is "outweighed by the probability that its admission will necessitate undue consumption of time, will create substantial danger of undue prejudice, confusion of the issues, or if it might mislead the jury"; (3) such testimony is inherently unreliable; (4) the testimony is "predicated on a fallacy"; and (5) if admitted, the jury must be instructed that CSAAS evidence should not be used to determine whether the victims' claims of abuse are true.

### 2. Standard of review

Expert opinion testimony is admissible when the subject matter is "beyond common experience" and the opinion would assist the trier of fact. (Evid. Code, § 801, subd. (a).) " 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see also *In re S.C.* (2006) 138 Cal.App.4th 396, 418; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*); *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956; *People v. Harlan* (1990)

19

222 Cal.App.3d 439, 449–450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116–117.) CSAAS evidence "is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394.) "For instance, where a child delays a significant period of time before reporting an incident or pattern of abuse, an expert could testify that such delayed reporting is not inconsistent with the secretive environment often created by an abuser who occupies a position of trust." (*Ibid.*) CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin, supra,* at pp. 1300–1301, fn. omitted.)

### 3. Analysis

### a. CSAAS evidence is admissible in California

As Pacheco himself acknowledges, the California Supreme Court ruled in *McAlpin* that CSAAS evidence is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse victims' behavior and to explain seemingly contradictory behavior of a child sexual abuse victim. (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1302.) As this court is bound by decisions of the California Supreme Court, Pacheco's citations to decisions from other jurisdictions that reached different outcomes on the reliability and admissibility of CSAAS testimony have no effect on the binding nature of *McAlpin*. (See *People v. Ramirez* (2023) 98 Cal.App.5th 175, 216 (*Ramirez*).) In addition, Pacheco has not cited any new studies or changes in scientific understanding that would justify our

20

reconsidering a long line of California decisions on this topic. Based on binding precedent, as well as the substantial precedent set forth above regarding admissibility of CSAAS evidence, nothing in the record here casts doubt on the trial court's apparent determination that CSAAS could assist the jury for the limited purpose the Supreme Court has authorized. (See *McAlpin, supra*, 53 Cal.3d at pp. 1300–1302; *Lapenias, supra*, 67 Cal.App.5th at p. 172; *Patino, supra*, 26 Cal.App.4th at pp. 1744–1745; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.) For example, the trial court could reasonably conclude that, in addition to the victims' delayed disclosure, M. Doe's text messages with Pacheco and her decision to not disclose the full scope of the abuse when her mother learned of those text messages are the types of seemingly self-impeaching behaviors for which the Supreme Court has recognized that CSAAS evidence may be helpful. Accordingly, we conclude the trial court did not abuse its discretion when it ruled that the prosecution's proposed expert testimony on CSAAS was admissible for the limited purpose for which it was admitted in the instant case.

### b. No abuse of discretion under Evidence Code section 352

We also reject Pacheco's argument that the trial court abused its discretion by failing to exclude Dr. Maltby's testimony pursuant to Evidence Code section 352. "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314–1315.) "Evidence only creates 'undue prejudice' if the evidence tends to evoke an emotional bias against the defendant, and the evidence has relatively little importance based on the specific issues involved in the particular case. [Citation.]" (*Lapenias, supra*, 67 Cal.App.5th at p. 174.)

Here, any possible prejudicial impact of the CSAAS testimony—none of which was tied to the facts of this case in any way—was slight in comparison to

21

the charged conduct. The trial court, after considering the parties' arguments and having been informed about the scope of Dr. Maltby's testimony, determined that its probative value outweighed the possible prejudice. The trial court's ruling cannot be described as arbitrary or capricious and we conclude it did not abuse its discretion in admitting the testimony.

### c. Dr. Maltby's testimony not improper "profile" evidence

Pacheco asserts that Dr. Maltby's CSAAS testimony went beyond describing myths or misconceptions about how child abuse victims should act and instead "created a profile of who child sexual abusers are, how sexual abuse occurs, and how victims of sexual abuse act." Pacheco also argues Dr. Maltby's testimony exceeded the bounds of permissible CSAAS evidence by using quantitative adjectives and phrases, such as "most," "many," "often," "much more common," "over 90 percent," and "most cases," to create a profile of a child sexual abuser that closely hewed to the facts of this case. Pacheco contends these portions of Dr. Maltby's testimony constituted improper "profiling" under *People v. Robbie* (2001) 92 Cal.App.4th 1075.

As discussed above, Dr. Maltby testified that she did not conduct any investigation of this case, had not interviewed any witnesses, read any police reports or transcripts, spoken to any of the attorneys, knew nothing about the facts or charges alleged, had never met Pacheco, and had not spoken to any law enforcement officers about it. She testified to four of the five general categories of CSAAS and explained that it was not "a checklist for diagnosing sexual abuse. You can't diagnose sexual abuse." In addition, the trial court instructed the jury that Dr. Maltby's testimony was *not* evidence Pacheco committed any of the crimes and may only be considered in deciding whether the victims' conduct was not inconsistent "with the conduct of someone who has been molested, and in evaluating the believability of the testimony." To the extent Pacheco argues Dr.

22

Maltby's specific testimony about how child sexual abuse victims may behave and their potential reactions to such abuse was improper, we find no error and such testimony was properly admitted.

Assuming without deciding that one aspect of Dr. Maltby's testimony was improper, specifically her testimony that "90 percent" of the time the perpetrator of child sexual abuse is a person the victim knows and trusts, such as a family member, "a coach, a teacher, a mentor, [or] a friend's parents," we conclude that any error was harmless.

Generally, the application of ordinary rules of evidence does not implicate the federal Constitution; accordingly, we review allegations of error under the "reasonable probabilit[y]" standard of *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*), unless the erroneous admission of evidence affects the fundamental fairness of the trial, in which case we apply the de novo standard of review. (*People v. Marks* (2003) 31 Cal.4th 197, 227; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.)

During trial, M. Doe recounted in detail how Pacheco sexually abused her starting at the age of 12. She testified that Pacheco would tell her she "was beautiful and that he wanted a different kind of relationship." Thereafter, on three different occasions, Pacheco touched her vagina. At a July 4, 2016 event, Pacheco pushed M. Doe to the ground and started kissing her. The jury heard testimony from M. Doe and her mother about text messages from Pacheco and screen shots of those messages were introduced into evidence. In one of those exchanges, Pacheco texted, " 'You don't kiss me[]' " and M. Doe replied, " 'Tomorrow if you come. Okay, baby.' " Pacheco replied, " 'No. I'm not going to come back. You never kiss me.' " M. Doe texted to Pacheco, " 'Yes, you have to come,' " and he replied, " 'For what?' " M. Doe responded, " ' So that I can kiss you.' "

23

J. Doe also detailed the various times Pacheco sexually abused her around the time she was eight years old. She recounted how Pacheco, on separate occasions in the backseat of his vehicle, put his penis inside her vagina. Pacheco also told J. Doe if she said anything he would "do something" to her family.

Given this record, we do not find it is reasonably probable that Pacheco would have achieved a more favorable result had the trial court excluded Dr. Maltby's testimony that "90 percent" of child sexual abusers are someone the victim knows and trusts. (*Watson*, *supra*, 46 Cal.2d at p. 837.) Therefore, even assuming the trial court erred in not excluding this testimony, that error was harmless.

### d. No error in instructing with CALCRIM No. 1193

Pacheco also contends that the trial court erred by using CALCRIM No. 1193 to instruct the jury and that the jury should have been instructed with CALJIC 10.64 instead.[11] According to Pacheco, CALCRIM No. 1193 improperly allowed the jury to use "CSAAS evidence to prove [his] guilt."

As a threshold matter, the Attorney General argues that Pacheco has forfeited his claim of instructional error by failing to object to CALCRIM No. 1193 at trial. Because Pacheco contends the challenged instruction was an

---

[11] CALJIC No. 10.64, as tailored to a case involving sexual abuse of a female child, would provide: "Evidence has been presented to you concerning [CSAAS]. This evidence is not received and must not be considered by you as proof that the alleged victim's molestation claim is true. [¶] [CSAAS] research is based upon an approach that is completely different from that which you must take to this case. The syndrome research begins with the assumption that a molestation has occurred, and seeks to describe and explain common reactions of children to that experience. As distinguished from that research approach, you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt. [¶] You should consider the evidence concerning the syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions, as demonstrated by the evidence, are not inconsistent with her having been molested."

24

incorrect statement of law and affected his substantial rights under section 1259, we decide that we can consider the merits of his claim despite his failure to object below. (See *People v. Grandberry* (2019) 35 Cal.App.5th 599, 604 (*Grandberry*); *People v. Gomez* (2018) 6 Cal.5th 243, 312 (*Gomez*); *People v. Townsel* (2016) 63 Cal.4th 25, 59–60 (*Townsel*).)

### *i. Additional background*

In connection with the in limine motions regarding CSAAS evidence, both parties requested that the jury be instructed on how to consider that evidence. The prosecutor averred that the evidence would "not be offered to prove that a sexual assault occurred" and asked that the jury be admonished with "[]CALCRIM 1193/CALJIC 10.64[]" to "prevent the jury from considering the testimony for any improper purpose." Pacheco's counsel did not cite a specific jury instruction but asked that the jury be instructed that "the [CSAAS] testimony is introduced to dispel a myth the jury must not use that evidence to predict a molest has been committed." (*Sic*.) Defense counsel also quoted *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735 where the court stated that "if requested the jury must be admonished 'that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true … The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested.' [Citation.]"

Without objection, the trial court instructed the jury pursuant to CALCRIM No. 1193: "You have heard testimony from Dr. Lauren Maltby regarding child sexual abuse accommodation syndrome. [¶] Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] Dr. Lauren

25

Maltby's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [M. Doe]'s conduct or [J. Doe]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of the testimony."

### ii. Applicable legal principles and standard of review

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 (*Ramos*).) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid.*)

### iii. Analysis

The trial court did not err in instructing the jury with CALCRIM No. 1193 because it is not reasonably likely that jurors understood the instruction as permitting the use of Dr. Maltby's testimony for the improper purpose of proving that Pacheco molested M. Doe and J. Doe. "CALCRIM No. 1193 informs jurors that they may use CSAAS evidence to evaluate whether the alleged victim's behavior, which may appear inconsistent with being molested, was actually not inconsistent with the behavior of a child sexual abuse victim." (*Ramirez, supra*, 98 Cal.App.5th at p. 219.) As noted in *Ramirez*, "CSAAS evidence is relevant and admissible when an alleged victim's credibility has been attacked. [Citation.]" (*Ibid.*)

26

Pacheco argues that CALCRIM 1193 permitted the jury to consider CSAAS evidence "in evaluating the believability of [the victims'] testimony.' " In his view, "using CSAAS evidence to evaluate whether the victim's testimony is believable (which CALCRIM 1193 allows) and using it to evaluate whether the victim's claims are true (a purpose which is forbidden), is a distinction without a difference." Multiple courts have rejected similar challenges to CALCRIM 1193, such as *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*), *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*), and *Lapenias, supra*, 67 Cal.App.5th 162. Assuming without deciding that reference to "believability" as a distinct purpose in the last sentence of the instruction may create some ambiguity, we consider it unlikely that the jury here would have applied the instruction in an impermissible manner. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) Dr. Maltby's testimony was appropriately limited—she did not render an opinion on whether the victims were molested and clarified that CSAAS is a "group of concepts," rather than "a diagnostic tool." The prosecutor did not argue improper inferences from Dr. Maltby's testimony. Contrary to Pacheco's contention on appeal that jurors would interpret CALCRIM No. 1193 as allowing them to conclude that the complaining witnesses were in fact abused, CALCRIM No. 1193 expressly informed the jury that CSAAS evidence "is not evidence that the defendant committed any of the crimes charged against him."

The jurors were also instructed that they were the sole judge of a witness's credibility and were not required to accept an expert's opinion as true. Dr. Maltby herself testified that she was not familiar with any of the facts of the case and was not proffering an opinion as to whether any crime(s) took place. In closing argument, the prosecutor discussed Dr. Maltby's testimony regarding secrecy, delayed disclosure, accommodation, and helplessness and indicated that CSAAS explains how it is not "inconsistent for a child to not say anything, to still want to

27

be with their abuser, because sometimes that relationship can feel special." The prosecutor also reiterated that Dr. Maltby "did not come in here to give any opinions about who is telling the truth, who has been molested, or if the defendant committed the crime." Finally, the prosecutor directed the jury to evaluate the victims' credibility based on their demeanor on the witness stand and how they had no motive to lie.

On this record, we find no merit to Pacheco's argument that the reference to the "believability of [the victims'] testimony" in CALCRIM No. 1193 would have led the jury to believe it was free to use the CSAAS evidence to conclude that the victims were telling the truth, thus proving Pacheco's guilt. We also reject Pacheco's claim that the instruction impermissibly lowered the prosecutor's burden of proof and conclude that it is not reasonably likely that jurors understood the instruction as permitting the use of CSAAS evidence for the improper purpose of proving that Pacheco molested M. Doe and J. Doe.[12]

Accordingly, we conclude that Pacheco's claim regarding CALCRIM No. 1193 is without merit. (*Gonzales, supra,* 16 Cal.App.5th at pp. 503–504 [rejecting contention that CALCRIM No. 1193 allows a jury to use CSAAS testimony as proof that the victim was molested]; accord, *Munch, supra*, 52 Cal.App.5th at pp. 473–474; *Lapenias, supra*, 67 Cal.App.5th at pp. 175–176.)[13]

---

[12] It is true that CALJIC No. 10.64 provides information regarding CSAAS that is not contained in CALCRIM No. 1193, but that does not mean that CALCRIM No. 1193 fails to correctly state the law.

[13] Because there was no error in instructing the jury pursuant to CALCRIM No. 1193, we reject Pacheco's alternative argument that his trial counsel was ineffective for failing to object to that instruction. (*People v. Poslof* (2005) 126 Cal.App.4th 92, 99 (*Poslof* ).)

### e. No due process violation

Pacheco next contends that the admission of the CSAAS evidence violated his due process rights to a fair trial because, in his view, the CSAAS evidence was inadmissible, Dr. Maltby improperly used that evidence in her testimony, and CALCRIM 1193 "encouraged the jury to consider [Dr.] Maltby's testimony as evidence" of his guilt. Pacheco also argues that, to the extent this argument is deemed forfeited due to trial counsel's failure to timely object, his counsel was constitutionally ineffective. As discussed above, we have rejected Pacheco's arguments relating to each of his points.

Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process. (*Lapenias, supra*, 67 Cal.App.5th at p. 174, citing *People v. Hall* (1986) 41 Cal.3d 826, 834–835.) Reviewing courts have also routinely held the admission of CSAAS evidence does not violate due process. (See, e.g., *Patino, supra*, 26 Cal.App.4th at pp. 1744–1745 [trial court's admission of CSAAS evidence did not violate due process].) For the same reasons, we conclude that Dr. Maltby's testimony about CSAAS did not violate Pacheco's constitutional right to due process.

Further, we have already rejected Pacheco's contention that the trial court abused its discretion in admitting the evidence, due to its supposed lack of reliability. The "rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised" on appeal. (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29.) Having rejected the underlying claims of error in admitting the CSAAS evidence, we accordingly reject Pacheco's associated due process claim.

Pacheco's reliance on the length of deliberations, the jury's requests for readback of testimony, and the fact that the jury returned a mixed verdict, do not show he was prejudiced by admission of the CSAAS evidence. The jury's

29

acquittal on two counts (counts 6 and 9), its inability to reach a verdict on two others (counts 3 and 10), and its finding that Pacheo was guilty of a lesser included offense on count 1 is equally demonstrative of a conclusion that the jury was *not* unduly swayed by Dr. Maltby's testimony. Furthermore, the jury's requests for readback of J.R.'s testimony, M. Doe's testimony (about count 3), J. Doe's testimony (about counts 5 and 6), and Maria D.'s testimony (about the text messages between Pacheco and M. Doe she discovered) are more readily attributable to the jury's consideration of whether Pacheco committed the offenses alleged in counts 3, 5 and 6. That interpretation is consistent with the jury ultimately failing to reach a unanimous verdict on count 3 and acquitting him on count 6.[14]

### B. Instructional error on counts 7 and 8 (rape by force)

Pacheco contends the trial court erred by instructing the jury with a modified version of CALCRIM No. 1000 and that his convictions of forcible rape in counts 7 and 8 must be reversed. In his view, the court's modification "had the effect of negating or at least misleading the jury as to the lack-of-consent element of the offense."

The Attorney General argues that Pacheco has forfeited his claim of instructional error by failing to object to the modified instruction at trial. Because Pacheco contends the challenged instruction was an incorrect statement of law and affected his substantial rights under section 1259, we decide that we can consider

---

[14] As Pacheco has not demonstrated that the trial court erred in admitting the CSAAS evidence via Dr. Maltby's testimony or by instructing the jury with CALCRIM No. 1193, Pacheco cannot show ineffective assistance of counsel based on his trial counsel's failure to raise a due process objection below. (See *McAlpin, supra*, 53 Cal.3d at p. 1299 [admission of expert testimony analyzed under abuse of discretion standard]; *People v. Lopez* (2008) 42 Cal.4th 960, 966 [ineffective assistance of counsel claim requires a showing of deficient performance and prejudice].)

the merits of his claim despite his failure to object below. (See *Grandberry*, *supra*, 35 Cal.App.5th at p. 604; *Gomez, supra,* 6 Cal.5th 243 at p. 312; *Townsel, supra,* 63 Cal.4th at pp. 59–60.)

### 1. Additional background

The amended information charged Pacheco with three counts of sexual intercourse with a child under age 10 (§ 288.7, subd. (a); counts 4, 5, 6) and three counts of forcible rape (§ 261, subd. (a)(2); counts 7, 8, 9). All six counts were based on the three separate acts of sexual intercourse described by J. Doe in her testimony. At trial, J. Doe testified that all three incidents took place in Pacheco's car: once while picking up her aunt, once when getting ice cream, and once when going to the store. On cross-examination, after her recollection was refreshed with her preliminary examination testimony, J. Doe testified that the second incident took place when going to the store and the third incident was when she and Pacheco went to get ice cream. Each time, Pacheco got into the back seat with J. Doe, removed her clothing from the waist down, placed her on his lap, and had intercourse with her.

In closing argument, the prosecutor told the jury that "[J. Doe] testified and told us that the defendant raped her on three separate occasions that she can remember, at least three times. [¶] She gave us information that each time they happened in a car. She could remember that they were in San Jose. One time was on the way to pick up her aunt; but before they got there, they stopped in a parking lot by [a] [h]igh [s]chool. She remembered another time where they went to go get ice cream; but before they got to the ice cream store, he stopped the car, took off her clothes, had her go in the back seat, pulled her on his lap, and inserted his penis in her vagina. Then he took his hands and moved her little body up and down for his penis to go inside her vagina. [¶] She testified and told us of a third time that she remembered where the similar thing happened where she went to the

31

store with the defendant, he stopped the car, told her to go in the back seat. She listened. She was eight. He took off her clothes, he took off his clothes, he grabbed her again by the waist, put her on top, and inserted his penis in her vagina."

In his closing argument, defense counsel highlighted how J. Doe testified that she was "molested in public with no adults noticing anything." Later, he argued, "So how did [J. Doe] come to be alone with [Pacheco]? She doesn't remember at all. And again, Dr. Maltby told you, she said, look, kids get these things mixed up. Some child is being abused time and time again. You can't rely upon them to say X thing happened first, X thing happened second, X thing happened third. [¶] This is the very first allegation of abuse. This is the first time she said it happened. She doesn't remember how she became alone with him." Counsel reminded the jury that Maria D. testified that it was her rule that "when one sibling goes out, the other siblings go out" and that M. Doe and J. Doe agreed that this was the rule. Defense counsel argued that, without some corroborating evidence, the jury should not believe that Maria D. "broke her own rule" three separate times by allowing J. Doe to be alone with Pacheco in his car. He also highlighted Maria D.'s testimony that "she doesn't recall anyone ever going to an ice cream shop" as well as how J. Doe misremembered that the incident where she went to the store occurred before the incident where she went to get ice cream.

The trial court instructed the jury, without objection,[15] regarding the charges of forcible rape with a modified version of CALCRIM No. 1000, as

---

[15] The court and the parties discussed the jury instructions off the record. The court informed the parties that, after that conference, it would "come back on the record and any objections to any of the instructions are placed on the record at that time." On the record, the court noted that "with the exception of two areas for instruction, there is an agreement among the parties regarding the remaining

32

follows: "The defendant is charged with rape by force in violation of Penal Code section 261(a) in counts 7 through 9. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant had sexual intercourse with a person; two, the person did not consent to the intercourse; and three, the defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the person or someone else. [¶] Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis. Ejaculation is not required. [¶] Intercourse is accomplished by force if a person uses enough physical force to overcome the woman's will. [¶] Duress means a direct or implied threat of force, violence, danger, or retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise. When deciding whether the act was accomplished by duress, consider all of the circumstances, including the person's age and her relationship to the defendant. [¶] Menace means a threat, statement, or act showing an intent to injure someone. [¶] Intercourse is accomplished by fear if the person is actually and reasonably afraid or is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it. [¶] A person under the age of 18 cannot consent to intercourse. [¶] It is not required that the child physically resist or fight back in order to communicate lack of consent."

As read to the jury, this instruction differed from the model instruction in two respects. First, it deleted the sentence, "To consent, a woman must act freely and voluntarily and know the nature of the act." (CALCRIM No. 1000.) Second, it added the following sentence: "A person under the age of 18 cannot consent to

---

instructions." Defense counsel did not express any disagreement with CALCRIM No. 1000 or the court's modifications thereto.

33

intercourse." As noted above, the jury convicted Pacheco on two counts of forcible rape, counts 7 and 8, but acquitted him on the third such count, count 9.

### 2. Applicable legal principles and standard of review

The forcible rape charges required the prosecution to prove beyond a reasonable doubt that Pacheco accomplished the offenses "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 261, subd. (a)(2).) In a prosecution for forcible rape, "in which consent is at issue, 'consent' means positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6, subd. (a).)

A trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offenses. (*People v. Howard* (2024) 104 Cal.App.5th 625, 660, citing *People v. Merritt* (2017) 2 Cal.5th 819, 824.) "We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*Ramos, supra,* 163 Cal.App.4th at p. 1088.) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*Richardson, supra,* 43 Cal.4th at p. 1028.) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid.*)

### 3. Analysis

#### a. The modified instruction

The Attorney General argues the modified version of CALCRIM No. 1000 was appropriate in this case and it is not reasonably likely the jury misapplied the law. In his view, because J. Doe was only eight years old at the time of the offenses, she could not have actually consented to having sexual intercourse.

34

In a prosecution for forcible rape, "in which consent is at issue," actual consent requires the victim to "act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) At least one court has concluded, "[w]here, as here, the alleged victim is a child below the age of legal consent, whether the child has the capacity to 'consent' to an act of sexual intercourse within the meaning of section 261.6 will usually be a question of fact. When it is charged that an act is against the will of a person, ' "consent is at issue." ' [Citation.] It will be for the trier of fact to determine, based upon the age and maturity of the child and the circumstances as shown by the evidence in a particular case, whether the child is capable of 'positive cooperation in act or attitude pursuant to an exercise of free will' or able to 'act freely and voluntarily' with 'knowledge of the nature of the act or transaction involved.' (§ 261.6; see *People* v. *White* [(1986)] 179 Cal.App.3d 193, 202.)" (*People v. Young* (1987) 190 Cal.App.3d 248, 257.)

We are aware that in *People v. Soto* (2011) 51 Cal.4th 229, 247 (*Soto*), the Supreme Court observed that, in the context of the statute prohibiting lewd acts on a child (§ 288), "California law has long recognized that consent is not a defense when the victim of a sex crime is a child under the age 14." There is also dictum in *Soto* to support the Attorney General's argument here that consent is also not a valid defense to forcible rape of a child under 14. (*Soto*, at p. 238 ["For over 100 years, California law has consistently provided that children under age 14 cannot give valid legal consent to sexual acts with adults"].) However, in this case, we need not decide whether it was error to omit language from CALCRIM No. 1000 instructing the jury that "consent" means that "a woman must act freely and voluntarily and know the nature of the act." As discussed in more detail below, even assuming error, that omission was not prejudicial based on our review of the record.

35

### b. Assuming error, Pacheco was not prejudiced

The Attorney General argues that even assuming the trial court's modification to CALCRIM No. 1000 was error, that error was harmless.  We agree.

In *People v. Merritt* (2017) 2 Cal.5th 819 (*Merritt*), the California Supreme Court discussed circumstances an appellate court may consider in analyzing whether the failure to instruct on an element of the offense was harmless error. (*Merritt*, *supra*, at pp. 831–832.)  For example, was the missing element "accurately described" to the jury by "both parties"?  (*Id*. at p. 831.)  Did the defendant concede or admit the missing element?  (*Ibid*.)  Was " 'the omitted element … uncontested and supported by overwhelming evidence … .' [Citation.]"?  (*Id*. at p. 832.)  Finally, does "what the jury, properly instructed, necessarily found support[] the conclusion that the error did not contribute to the verdict"?  (*Ibid*.)

If a trial court incorrectly instructs on an element of a charged offense such that the error impermissibly shifted or lowered the burden of proof for that element, the applicable standard of prejudice is the *Chapman* standard.  (See *Rose v. Clark* (1986) 478 U.S. 570, 570–581, overruled on other grounds in *Brecht v. Abrahamson* (1993) 507 U.S. 619, 637.)  Under the *Chapman* standard, a federal constitutional error requires reversal unless the People show the error was "harmless beyond a reasonable doubt."  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

In the case of *In re Lopez* (2023) 14 Cal.5th 562 (*In re Lopez*), the California Supreme Court further clarified the standard for evaluating harmless error arising from an instruction with omitted required elements.  Specifically in *Lopez*, the California Supreme Court stated that for the error to be harmless, the state must show "it would be impossible, based on the evidence, for a jury to make

36

the findings reflected in its verdict without also making the findings that would support a valid theory of liability." (*In re Lopez*, *supra*, at p. 568.) "[W]hile 'overwhelming' evidence may demonstrate harmlessness, a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply. Instead, the analysis requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well. [Citation.]" (*Ibid*) "The question here is not the sufficiency of the evidence to support a valid theory, but its opposite." (*Id.* at p. 591.)

"We do not focus exclusively on the evidence favorable to the verdict, and we do not presume the existence of any facts the jury might reasonably infer in favor of the prosecution." (*People v. Madrigal* (2023) 93 Cal.App.5th 219, 243 (*Madrigal*), citing *People v. Mil* (2012) 53 Cal.4th 400.) "We do not view the evidence in the light most favorable to the prosecution. We review the evidence in the light most favorable to the defendant, and in doing so, we do not reweigh the evidence or resolve evidentiary conflicts. [Citations.]" (*Madrigal*, at p. 243.) "The testimony of a single witness may be sufficient—even if there is significant countervailing evidence, and the testimony is subject to justifiable suspicion." (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1167 (*Valenti*), citing *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) "If a thorough review of the record shows there is any evidence that a rational juror could find as a basis for reasonable doubt as to any erroneously omitted element, then the error requires reversal, even when there is 'ample evidence' to support a finding of guilt." (*Madrigal, supra*, 93 Cal.App.5th at p. 243, citing *Valenti, supra*, 243 Cal.App.4th at p. 1166.)

37

The Attorney General argues that J. Doe's testimony about how Pacheco removed her clothing, picked her up, and placed her on his lap, with his hands around her waist as he penetrated her "demonstrated that she did not engage in sexual intercourse with him in 'an exercise of free will' or 'freely and voluntarily.' " As noted above, the burden is on the Attorney General to show that "no 'rational juror who … heard the evidence at trial could have had reasonable doubt' " (*People v. Schuller* (2023) 15 Cal.5th 237, 244) that J. Doe actually consented to what occurred.

At trial, J. Doe testified that, after Pacheco removed her clothing from the waist down, he picked her up and, still holding her around the waist, placed her on his lap. Pacheco then put his penis inside J. Doe's vagina and began moving her up and down. J. Doe testified that she tried to move away from Pacheco but could not because he was taller, heavier, and stronger. J. Doe was scared and Pacheco threatened to do something to her family if she told anyone. Based on this evidence, the jury found, as properly instructed, that Pacheco "accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury." The instruction also told the jury that, for the purposes of counts 7 and 8, "force" meant that Pacheco "use[d] enough physical force *to overcome the woman's will*" and that "duress" meant that Pacheco made a "direct or implied threat of force, violence, danger, or retribution that [] cause[d] a reasonable person *to do or submit to something that she would not do or submit to otherwise*."[16] (Italics added.) The jury's finding that Pacheco used "force, violence, duress, menace, or fear of … bodily injury" means that it necessarily would have concluded that eight-year-old J. Doe did not consent to having intercourse with

[16] In "deciding whether the act was accomplished by duress," the jury was instructed that it should "consider all of the circumstances, *including the person's age* and her relationship to the defendant." (Italics added.)

Pacheco. On these facts, no rational juror would have concluded that J. Doe "act[ed] freely and voluntarily and kn[e]w the nature of the act." (§ 261.6) Based on the evidence in this case, we conclude that a jury would not have "ma[d]e the findings reflected in its verdict without also making the findings that would support a valid theory of liability." (*In re Lopez*, *supra*, 14 Cal.5th 562 at p. 568.)

Accordingly, assuming error, the trial court's omission of the actual consent element from CALCRIM No. 1000 was harmless.[17]

### C. Error in sentencing minute order and abstract of judgment

Pacheco next argues that the abstract of judgment is incorrect in that it indicates that the trial court imposed a restitution fund fine of $330 pursuant to section 1202.4 but at sentencing the trial court stated that the amount of that fine was $300. The Attorney General agrees that the abstract of judgment is incorrect. We agree as well, but further note that the July 8, 2024 minute order from the sentencing hearing also incorrectly reflects a restitution fund fine of $330.

"Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) We will therefore direct the trial court to correct both the minute order and the abstract of judgment to reflect the correct amount of the fine, i.e., $300.

### III. DISPOSITION

The judgment is affirmed. The trial court is directed to correct the July 8, 2024 sentencing minute order and abstract of judgment to reflect the $300 restitution fund fine orally pronounced at sentencing. A certified copy of the

---

[17] Consequently, we need not reach Pacheco's alternative argument that his trial counsel was ineffective for failing to object to that instruction. (*Poslof, supra,* 126 Cal.App.4th at p. 99.)

39

corrected abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.

_____
WILSON, J.

WE CONCUR:


_____
GROVER, ACTING P. J.




_____
LIE, J.




*People v. Pacheco*
H052374